By the Court. Hoffman, J.
The first question to be considered is the important one, whether the plaintiff is entitled to recover against any one, upon his own showing; whether his agreement was not one which public policy forbids to be enforced.
The case to present this question is briefly this. A company had been incorporated by the State of Illinois, to construct a railroad within that State. Acts of the States of Indiana and Ohio had also been procured, under which, together, a road was to be made from Cincinnati in Ohio, to Illinois Town. The plaintiff was employed by Hezekiah C. Seymour, one of the firm of H. C. Seymour & Co., acting on behalf of such firm, to procure for such firm contracts with such Railroad Company, for the constructing of the said roads¡ and furnishing and equipping the same. .That by his labor and services, the contracts were procured for the firm; and that they agreed to pay him $10,000. That the contracts were of great pecuniary emolu *90 ment; that the firm realized large.profits, and the sum agreed to be paid him was reasonable.
That the firm was to receive for completing the road from Illinois town, a portion of the route, two millions five hundred thousand dollars, and, for the residue of the route, six millions five hundred thousand dollars.
Since the 24th of July 1853, the firm had sold and transferred all their interest to Henry D. Bacon, or to a firm of Page & Bacon, or Bacon, Page, & Co. Such is an outline of the complaint.
It appears that the contract with H. C. Seymour and associates, was made in November 1851,—That H. C. Seymour died in July 1853. It does not appear that anything was done under the contract in his lifetime; but it is shown, that, after his death, the whole interest in the contract was disposed of, and realized five hundred thousand dollars.
And the case made by the plaintiff is, that he recommended Seymour to one Clements, who knew nothing of him. That Clements recommended Seymour to the Directors, in consequence of the plaintiff’s attestation to his qualities. That Clements was employed when the Company was preparing to let the Road, and was to have a good commission, which was adjusted afterwards at $10,000. That Clements engaged, for these considerations, to use his influence, and did use it, to procure the contract for Seymour. . That such influence was successful, or at least influential in obtaining the object. As he deposes—“We did not stand upon the street corners to do this, but went to work through third parties, and in every way we could.”
In addition, when Clements first undertook this office, Davison did not even name to him the intended contractors. He did not appear before the Directors openly as Seymour’s agent. On the contrary, he first informed them that he had friends at the East who could send on good men to take the contract. In the course of the negotiations he named Seymour; but this was to the Directors individually, as I infer. To the Board he was unknown.
Undoubtedly, this was the employment of Clements for a' bribe, to use personal influence with the Directors to secure a lucrative contract for one, of whose capacity or responsibility .he *91 was entirely ignorant. He was to nse this secretly, and with individuals.
The-directors of this great rail-road scheme, if they stood not in the capacity of public officers owing a duty to the state, yet were trustees of the stock-holders of the road, and owed the best efforts of industry, integrity, and economy to them.
No one can deny that a stipulation for any personal advantage or profit, which might attend and influence the discharge of their trust to the stock-holders, would be a violation of duty; and no ' engagement given to them, or contract made with them, for that object, could bear the scrutiny of the law.
If, again, one of their officers—if Mitchell, for example, empowered to negotiate, and finally to settle the contract with Seymour, had received an obligation for the payment of a sum of money for his services, it could never have been enforced.
Does the present case fall within the principle which would avoid such agreements ? Numerous authorities have been cited by the Counsel of the defendants. The most of them are reviewed in Gray v. Hook (4 Comstock, 451.)
That case was one of an agreement between two applicants for the office of Inspector of flour, that one should withdraw his application, and aid the appointment of the other; in consideration of which, he was to receive half the emoluments of the office. This was held void at common law, though not within the statute prohibiting the sale of public offices.
The case of Waldo v. Martin (4 Barnwell & Cresswell, 319, and 1st Carr. & Payne 1) is very similar, where the power of appointment was in an individual. The holder of an office resigned it in favor of another, with an agreement to procure the appointment for him in consideration of receiving a moiety of the profits. A covenant was executed to carry the arrangement into effect, and the deed was held void, as a fraud upon the party making the appointment.
Hanington v. Duchastel (2 Swanton, 167 n.)reported imperfectly in 1 Br. C. R. 115, is one of the most striking decisions of that rough, great lawyer, Lord Thurlow. The Earl of Rochford was Groom of the stole, and had the appointment of royal pages. He agreed with Hanington, to get him the place, on his giving a bond securing an annuity'of £100 to one St. Feroil, who was a *92 foreigner, and could not hold the station. The present defendant brought an action as administrator of St. Feroil, to recover arrears of the annuity; and this bill was brought to have the bond given up, and declared void.
Lord Thurlow observed, that there was no distinction, whether the office was public or private; none between public and private servants; and next, that the King’s servants were not merely private servants. He proceeded: “ It is impossible to bring the case to any other point than this, that the encouragement of the contract is contrary to the good of the public; and such good requires that the contract be put an end to; otherwise it would be a declaration of the law, that the party shall have the benefit of the contract, for the law approves what it refuses to rescind. It is a transaction on a foundation which ought not to be the basis of a civil contract. What I am to determine upon is, whether, if one person be authorized to recommend or appoint another to an office under a third person, he can, without the privity of the third person, for a private consideration of his own, recommend or appoint such other person ? It does not now seem to be contended that the bond would have been good, had it been given to Lord Bochford himself; now, if the contract itself was wrong, how can I make a difference? It would, perhaps, have made the point stronger.”
The case is very strong. Hanington received the profit of the station. St. Feroil, was as near as possible, innocent in the transaction. Lord Bochford sold,his influence, not directly, for a personal advantage, but to provide for his tutor. If this case be law, it must have a powerful influence upon the present.
The case of Hopkins v. Prescott (4 Com. Bench Rep. 518), was one of a bargain to use influence in obtaining an office connected with the collection of the revenue. It was held void under a particular statute; but Coleman Justice held, that it would have been void at common law, under the decision of Lord Thurlow, in Hanington v. Duchastel.
To these English cases may be added Money v. Macleod (2 Simon & Stuart, 301) where the question was, as to the legality of a contract to account for a share of emoluments for procuring the command of an East India Company ship. A material point of difference, however, is, that the plaintiff, whose influence it was *93 alleged, had been procured, was in the employ of the Company. He was not a director, nor in any way entitled to a voice in the selection. The Court directed an issue as to the consideration of the bond.
The case is not an absolute decision; but I do not see why an issue was ordered to the point of consideration, except upon the ground of an illegality, if it should be found to be what it was alleged.
The case of Marshall v. The Baltimore & Ohio R. R. Co. (16 Howard U. S. Rep. 325,) was one of a contract to make a certain compensation to an agent engaged in soliciting the votes and influence of members of a Legislature.
There are two propositions in the charge of the Judge, at the trial, which received the entire approbation of the Court, on a writ of error, and are of the highest pertinency and importance. I may assume that the Court was unanimous on these points. The three judges who dissented, did so upon the question of the jurisdiction of the Circuit Court.
After instructing the jury as to whether the contents of a letter was part of the agreement, which letter indicated' the use of improper means with the Legislature, the Judge charged:—“ That even if there were no such agreement, yet the contract was against the policy of the law, and void, if, at the time it was made, the parties agreed to conceal from the members of the Legislature, the fact, that the plaintiff was employed by the defendants as their agent, to advocate the passage of the law, and was to receive a compensation in money for his services, in case the law was passed.”
“ Next, if there were no actual agreement to practise such concealment, yet he was not entitled to recover, if he did conceal from the members of the Legislature, when advocating the passage of the law, that he was acting as agent of the defendants, and was to receive a compensation in case the law passed.”
This authority is, to my mind, conclusive, unless there be a distinction between the cases of undue influence used with members of a Legislature, and cases of the same influence used with Directors of a Corporation.
The authorities cited in Gray v. Hook, especially Fuller v. Daine (18 Pick. 472), tend to sustain a similar principle.
*94 The latter case has been much criticised by counsel, and it is proper to make some observations upon it.
One Daine, the defendant, was the owner of land adjacent certain flats. It was an object to him to get the Worcester railroad company to erect a depot on these flats. He entered into an agreement with one Henry H. Fuller, that they should unite in getting up a company to purchase the flats, and procure the railroad company to locate the depot there. He was to make Fuller a pecuniary compensation (by delivery of a note executed and put in escrow) if the location took place. A company was formed; the flats purchased; and the railroad company agreed to establish the depot on the flats. Fuller was a member of this latter company at the time of the agreement, and afterwards became a member of the joint-stock company. The agreement was known only to the parties and a witness. The note had been endorsed to the present plaintiff after its maturity. It was held that the agreement was against public policy, and void. It affected the public interest. It affected the interests of the Worcester Railroad, and also those of the Joint Stock Company.
The promise in this case was, it is true, with one who held the position of a director in one of the companies. But it will be found that the reasoning of the Chief Justice rests upon principles which must extend to every contract with any one engaged to use similar means for an undue influence.
The case of Sedgwick v. Staunton (18 Barbour Rep. 475), does not affect these positions. Legitimate efforts were made by an avowed attorney and agent, to present to the Commissioners of the Land Office a case favorable to the applicant. See further, Harris v. Roof's Executors (10 Barbour Rep. 489).
I am led to the conclusion that it would be impossible to allow Clements to sustain ah action upon the agreement with him, There was in it most of those elements of a vicious contract, which have avoided similar obligations in the leading cases cited. There was secrecy, applications to individuals, a concealed promise of compensation, and utter ignorance and recklessness as to the competency of the party whose cause he was promoting, and whose reward he was to receive. There is this difference, that these directors were servants of an organization inferior to that of a State, yet acting in a very spacious sphere, and repre? *95 seating an extensive body of constituents. The distinction between their position and that of Legislators, upon a question like this, appears to me but shadowy,
If, then, the claim of Clements would be promptly rejected, does the present plaintiff stand in a better position ? His original employment might have been consistent with an open avowed agency—with an intent, or instructions, to make it known; and thus be free from all objection. But we are left in ignorance of what the terms of such original agreement were; and how far they extended. All is indefinite, except merely an employment. He engages Clements; and here again that employment may have been perfectly free from censure on the plaintiff’s part. But, we cannot separate the acts of Clements from the acts of the plaintiff. There is a legal identity between them for the purposes of this action. The plaintiff must be held, to have employed Clements to do what he did do, or to have been bound to superintend his proceedings, and free them from what was illegal. It is impossible to permit him to profit by the misdeeds of his own agent, however ignorant and exempt from them himself. His ignorance, when knowledge was a duty, becomes equivalent to a fault.
The judgment must be reversed and the complaint dismissed.